George Patrick O'DONNELL, Cheryl Lee O'Donnell, and Matthew D. Lyons, Appellants–Plaintiffs,

v.

AMERICAN EMPLOYERS INSURANCE COMPANY, Cincinnati Insurance Company, and The Farmers & Merchants State Bank, Administrator of the Donald L. Hummel Estate, Appellees–Defendants.

No. 09A02–9211–CV–536.

Court of Appeals of Indiana, Second District.

Oct. 28, 1993.

Frank E. Tolbert, John S. Damm, Miller, Tolbert, Muehlhausen, Muehlhausen & Groff, P.C., Logansport, for appellants-plaintiffs.

John T. Lorenz, Indianapolis, for Cincinnati Ins. Co.

James L. Petersen, Stephen M. Terrell, Ice Miller Donadio & Ryan, Indianapolis, for American Employers Ins. Co.

NAJAM, Judge.

### STATEMENT OF THE CASE

George and Cheryl O'Donnell ("O'Donnells"), and Matthew Lyons appeal from a summary judgment entered in favor of American Employers Insurance Company ("American") and Cincinnati Insurance Company ("Cincinnati") in a declaratory judgment action brought by the O'Donnells and Lyons. The O'Donnells' son and Lyons were involved in an accident with a vehicle sold by Mike Raisor Pontiac–Isuzu ("Raisor Pontiac"). American and Cincinnati insured Raisor Pontiac under a garage liability policy and an umbrella liability policy, respectively. The O'Donnells and Lyons sought and were denied coverage under the policies.

We affirm.

### ISSUE

The question presented is whether a vehicle sold by a dealer under a retail install-

ment contract and security agreement was insured under the dealer's garage liability and commercial umbrella liability insurance policies when the vehicle was driven by the purchaser and involved in an accident.[1]

## FACTS

On June 3, 1991, Donald and Sonna Hummel executed a written purchase order invoice ("Purchase Order") for the purchase of a 1989 Chevrolet Corsica from Raisor Pontiac in Lafayette, Indiana.[2] The Purchase Order indicated that the total retail price of the Corsica would be $7,681.98, that the Hummels would pay a cash down payment of $624.50 and that Purdue Employees Federal Credit Union ("Credit Union") would be the lienholder for the $7,057.48 balance. The Hummels executed a Retail Installment Contract and Security Agreement ("Installment Contract") with Raisor Pontiac, presented a check for $350.00 and took delivery of the Corsica on the same day. The Hummels returned the next day, June 4, and gave Raisor Pontiac a second check for $274.50.[3]

On June 5, 1991, Donald Hummel was driving the Corsica when his vehicle collided with a vehicle driven by Matthew Lyons in Tippecanoe County. At the time of the accident, Raisor Pontiac held the certificate of title to the Corsica and the vehicle bore an interim license plate. Lyons sustained injuries in the accident. Sean O'Donnell, the O'Donnells' son and a passenger in Lyons' vehicle, died in the collision.

The day after the accident, June 6, 1991, the Hummels' $274.50 check to Raisor Pontiac was debited to their account, and on June 7, the $350.00 check was debited. Also on June 7, Raisor Pontiac assigned its Installment Contract with the Hummels to the Credit Union which remitted a check to Raisor Pontiac for $7,057.48, the amount financed. That check was debited to the Credit Union's account on June 12. Raisor Pontiac transferred the Certificate of Title to the Hummels on June 11, six days after the accident.

At the time of the accident, Raisor Pontiac was insured under policies issued by both American and Cincinnati. American insured Raisor Pontiac under a garage liability policy, and Cincinnati insured the dealership under a commercial umbrella liability policy.

The O'Donnells and Lyons named Hummel as a defendant in a suit in the Tippecanoe Circuit Court, alleging that Hummel was negligent in his operation of the Corsica at the time of the collision. The O'Donnells and Lyons also filed a declaratory judgment action in the Cass Circuit Court seeking a determination "that coverage exists on both contracts of insurance with American and Cincinnati respectively based upon the facts and circumstances on the automobile operated by the Defendant Hummel...." The parties filed cross-motions for summary judgment in the declaratory judgment action. The court entered summary judgment against the O'Donnells and Lyons and in favor of American and Cincinnati. The O'Donnells and Lyons appeal from that judgment.

## DISCUSSION AND DECISION

### Standard of Review

■ A party appealing from the grant of a summary judgment must persuade a reviewing court that the trial court erroneously determined there was no genuine issue as to any material fact and that the moving party was entitled to judgment as a matter of law. *Dept. of Revenue v. Caylor–Nickel Clinic* (1992), Ind., 587 N.E.2d 1311, 1313; Ind.Trial Rule 56(C). As a reviewing court, we consider the same issues and conduct the same inquiry as the trial court. *See Caylor–Nickel Clinic*, 587 N.E.2d at 1313. On appeal, we carefully scrutinize the trial court's determination to

---

1. We heard oral argument in Indianapolis on August 5, 1993.

2. Following a pre-appeal conference, the parties stipulated to some but not all of these facts for the purposes of this action only. *See Order*

*Pursuant to Appellate Rule 2(C) Conference* (entered January 12, 1993).

3. In the stipulated facts, this amount is erroneously stated as $294.50.

assure that the non-prevailing party was not improperly prevented from having his day in court. *Id.*

## I. Garage Operations Policy

The O'Donnells and Lyons first seek coverage under American's garage liability policy based on the contention that Hummel was insured as a permissive user of the vehicle then owned by Raisor Pontiac and in use as part of Raisor Pontiac's garage operations.[4] American responds that Hummel could not be a permissive user and that the vehicle was not being used in Raisor Pontiac's garage operations because the Hummels owned the vehicle at the time of the accident. Accordingly, our decision in this case turns on whether the Hummels or Raisor Pontiac owned the vehicle when the accident with Lyons occurred.

### A. *Indicia of Ownership*

In insurance coverage cases, where an automobile dealer sells a vehicle but has not yet transferred the certificate of title to the buyer, ownership of a newly-purchased vehicle is established when the evidence shows that the parties have completed the sale transaction. *Ellis v. Weger* (1990), Ind.App., 550 N.E.2d 1347, 1351; *Royal Indemnity Insurance Co. v. Shue* (1962), 134 Ind.App. 322, 327, 182 N.E.2d 796, 799, *trans. denied.* Our courts have recognized several indicia of ownership of an automobile which are considered evidence of a completed sale, including: (1) whether the parties have executed the sales contract; (2) whether the buyer has remitted a down payment; (3) whether the sale was conditioned upon financing and whether financing was obtained; (4) whether the vehicle bears an interim license plate; and (5) whether title has passed from the seller to the buyer. *See Haskell v. Peterson Pontiac GMC Trucks* (1993), Ind.App., 609 N.E.2d 1160, 1164; *Weger v. Lawrence* (1991), Ind.App., 575 N.E.2d 659, 662, *trans. denied; Pekin Insurance Co. v. Charlie Rowe Chevrolet, Inc.* (1990), Ind.App., 556 N.E.2d 1367, 1370; *Ellis v. Weger*, 550 N.E.2d at 1352. The purchaser's use of an interim plate is proof of the sale and proof of ownership by the purchaser because the Indiana statute authorizing the use of such plates by the purchaser assumes both the sale of a vehicle and ownership by the purchaser.[5] *See Ellis v. Weger*, 550 N.E.2d at 1352.

Here, the evidence showed that the Hummels and Raisor Pontiac had executed all documents necessary to complete the sale of the vehicle. The Hummels signed the Purchase Order and financed the vehicle by means of the Installment Contract. The Hummels also remitted two checks

---

**4.** The American policy states in pertinent part:

"**SECTION II–LIABILITY COVERAGE**
. . . .
'**GARAGE OPERATIONS'–COVERED 'AUTOS'**
We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from "garage operations" involving the ownership, maintenance or use of covered "autos".
. . . .
1. WHO IS AN INSURED
a. The following are 'insureds' for covered 'autos':
(1) You [Raisor Pontiac] for any covered "auto".
(2) Anyone else while using with your permission a covered "auto" you own, hire or borrow...."
. . . .
**SECTION VI–DEFINITIONS**
. . . .

'Garage operations' includes the ownership, maintenance or use of the 'autos' indicated in Section I of this Coverage Form as covered 'autos'. Garage operations also include all operations necessary or incidental to a garage business."
Record at 51 and 60.

**5.** The statute provides in pertinent part:

"(c) Whenever a dealer or manufacturer *sells* a motor vehicle, the dealer may provide the buyer with an interim license plate....
(d) An interim plate authorizes a motor vehicle *owner* to operate the vehicle for a maximum period of thirty-one (31) days after the date of delivery of the vehicle to the *vehicle's owner* or until a regular license plate is issued, whichever occurs first."
IND.CODE § 9–18–26–10(b) and (c) (emphases added). Even the purchaser's retention of a dealer's plate after taking delivery does not negate ownership in the purchaser if the sale was consummated. *See Royal Indemnity*, 134 Ind. App. at 328, 182 N.E.2d at 799.

constituting a down payment on the vehicle. The first check was dated June 3, 1991, and the second was dated June 4, 1991. The Hummels took delivery of the vehicle on June 3, 1991, and Raisor Pontiac supplied the Hummels with an interim license plate.

Further, the purchaser in possession of a vehicle sold under a conditional sales contract, as a conditional vendee, is the owner of that vehicle and is not a permissive user under an insurance policy omnibus clause. *See Ellis v. Weger*, 550 N.E.2d at 1351 (citing IND.CODE § 9–4–1–11(d), the former version of I.C. § 9–13–2–121(b)); *Royal Indemnity*, 134 Ind.App. at 330, 182 N.E.2d at 800. We disagree with the O'Donnells' and Lyons' contention that the definition of "owner" under Title 9, Motor Vehicles, does not apply in this case. Indiana Code § 9–13–2–121(b) specifically provides that an "owner" includes a vendee under a conditional sale agreement, and that the definition applies to Indiana Code § 9–25 *et seq.*, Indiana's financial responsibility statute for the operation of motor vehicles.[6] This appeal concerns a claim for insurance coverage arising out of the alleged negligent operation of a motor vehicle by a conditional vendee. Accordingly, the definition of an "owner" under our financial responsibility statute applies to the question of who owned the vehicle sold by Raisor Pontiac.

In sum, "there was nothing left to be done to transfer ownership of the car" to the Hummels except for placing title in their name. *Haskell*, 609 N.E.2d at 1164. Numerous indicia of ownership by the Hummels are present in this case and are probative and compelling evidence that Raisor Pontiac and the Hummels had completed the sale before the accident. Likewise, the Hummels and Raisor Pontiac executed an installment contract which made the Hummels conditional vendees and owners of the vehicle for purposes of Indiana's financial responsibility statute. The undisputed material facts support the conclusion that the Hummels owned the vehicle when the accident with the O'Donnells' son and Lyons occurred.

### B. *Passage of Title*

The O'Donnells and Lyons contend nevertheless that Raisor Pontiac, and not the Hummels, owned the vehicle because title had not passed to the Hummels at the time of the accident. The O'Donnells and Lyons rely upon the following provision in the Purchase Order which they claim prevented title from passing to the Hummels: "Purchaser shall not have any rights in the Vehicle to be purchased until Dealer receives final payment."[7] Record at 74. American responds that this provision merely permitted Raisor Pontiac to retain a security interest in the vehicle. *See* IND. CODE § 26–1–2–401(1). The O'Donnells and Lyons counter that the final payment provision in the Purchase Order constituted an explicit agreement between Raisor Pontiac and the Hummels that title would not pass until final payment was made. *See*

---

**6.** Indiana Code § 9–13–2–121(b) states:
   "(b) 'Owner', for purposes of IC 9–21 and IC 9–25, means, when used in reference to a motor vehicle, a person who holds the legal title of a motor vehicle, or if a:
   (1) motor vehicle is the subject of an agreement for the conditional sale or lease of the motor vehicle with the right of purchase upon performance of the conditions stated in the agreement and with an immediate right of possession vested in the conditional vendee or lessee; or
   . . . .
   the conditional vendee or lessee or mortgagee is considered to be the owner for the purpose of IC 9–21 and IC 9–25."
   Here, the Installment Contract constitutes an agreement for the conditional sale of a vehicle by Raisor Pontiac to the Hummels. The Hummels had an immediate right of possession of the vehicle. The Hummels would then receive title free and clear of Raisor Pontiac's security interest in the vehicle after satisfying the condition that they make 48 monthly installment payments representing the balance owed on the purchase price plus interest.

**7.** Fundamental to this argument is the conclusion that the Hummels had not made final payment to Raisor Pontiac. At this point, we will assume that final payment had not been made and will postpone discussion of whether final payment had occurred until later in our discussion.

IND.CODE § 26–1–2–401(2).[8]

■ We first observe that under Indiana's version of the Uniform Commercial Code, the question of whether title has passed is no longer decisive in determining the ownership of goods. *See* IND.CODE § 26–1–2–101 Comment ("The legal consequences are stated as following directly from the contract and action taken under it without resorting to the idea of when property or title passed or was to pass as being the determining factor"). Whether title has passed is merely one indicium of ownership of property or goods in a sales transaction. *See Pekin*, 556 N.E.2d at 1370–71.

■ In any event, title to the vehicle had passed to the Hummels at the time of the accident. Indiana Code § 26–1–2–401 applies here and controls:

"(1) .... Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest....

(2) Unless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest...."

IND.CODE § 26–1–2–401(1) and (2). By retaining the vehicle's certificate of title following delivery to the Hummels, Raisor Pontiac retained only a security interest in the vehicle and title passed to the Hummels.

We agree that Section 2–401(2) generally permits the parties to form their own agreement concerning the passage of title to goods. However, Section 2–401(1) also provides that "any retention ... of the title ... is limited in effect to the reservation of a security interest," a provision which re-

stricts the parties' contractual freedom to delay passage of title by agreement under Section 2–401(2). *See In re Gull Air, Inc.* (Bankr.D.Mass.1987), 73 B.R. 820, 824 (quoting *Matter of Bosson* (D.Conn.1977), 432 F.Supp. 1013, 1020 n. 24). That language in Section 2–401(1), providing that any retention of the title is limited to the reservation of a security interest, "negates any attempt [by the parties] to forestall passage of title beyond the moment of final delivery; contract language purporting to do so merely results in a security interest being retained." *Id.; see In re Continental Fire Trucks, Inc.* (Bankr.D.Mass.1983), 33 B.R. 713, 715–16. Therefore, we conclude that the parties to a transaction for the sale of goods cannot delay passage of title to those goods past the moment of final delivery.

In *In re Continental Fire Trucks*, the court applied Sections 2–401(1) and (2) to a purchase order which stated that the purchaser "acquired no right, title and interest" in the property until delivery to the purchaser and the full purchase price was paid in cash or a satisfactory deferred payment plan was executed. *Id.* at 715 n. 2. The court rejected the argument that this "explicit agreement" under Section 2–401(2), which purported to forestall passage of title until either full cash payment or execution of a satisfactory deferred payment plan, prevented the passage of title and held that this restriction in the purchase order amounted only to the reservation of a security interest in the goods. *Id.* at 715–16.

Here, the Hummels took final delivery of the vehicle on June 3, 1991. Title passed to the Hummels when they took delivery, and the Purchase Order's "final payment" provision did not reserve for Raisor Pontiac any more than a security interest.[9]

8. The O'Donnells and Lyons also argue that the Purchase Order prevented the Hummels from acquiring *any* interest in the vehicle until they made final payment to Raisor Pontiac. If the Hummels did not have any interest in the vehicle, then according to the O'Donnells and Lyons, Raisor Pontiac could not have merely retained a security interest in the vehicle by maintaining possession of the certificate of title because a

security interest in property is not established unless the debtor (the Hummels) has rights in the collateral. *See* IND.CODE § 26–1–9–203(c). We cannot comprehend the logic in this argument because the Hummels did have rights in the collateral, including one of the most important rights, possession.

9. At oral argument, there was some confusion concerning the interplay between Section 2–

## C. *Condition of Final Payment*

■ Finally, we address the O'Donnells' and Lyons' related argument that the purchaser's rights provision in the Purchase Order prevented the Hummels from acquiring any rights in the vehicle, including ownership, until Raisor Pontiac received "final payment." The O'Donnells and Lyons define final payment by reference to Article Four of our commercial code, Bank Deposits and Collections, and specifically rely upon Indiana Code § 26–1–4–213, which provides that final payment occurs when a check is posted to the drawer's or maker's account. *See* IND.CODE § 26–1–4–213(1)(c). According to the O'Donnells and Lyons, final payment for the vehicle did not occur until two checks constituting a down payment were debited to the Hummels' account, which was after the accident.[10]

We reject the O'Donnells' and Lyons' interpretation of the final payment provision in the Purchase Order for two reasons. First, as part of the same transaction, the Purchase Order was merged into and extinguished by the Installment Contract. The Purchase Order merely memorialized the parties' meeting of the minds over the type of car, color of car and the agreed-upon purchase price. The Purchase Order did not provide for payment terms or create any security interest; rather, it stated the terms of the deal. The Installment Contract, in contrast, contained the parties' agreement to make final payment by remitting installment payments over a period of 48 months. Thus, the Hummels made final payment for the vehicle when they executed the Installment Contract and tendered checks for the down payment.

Second, even if we were to assume that the final payment provision controls the outcome of this case, we conclude that the Hummels made final payment for the vehicle prior to the accident. The O'Donnells' and Lyons' reliance upon Article Four is misplaced. Article Four governs bank deposits and collections, and Indiana Code Section 26–1–4–213 merely establishes the point in time when a payor bank has an obligation to pay a check. *See* I.C. 26–1–4–213(1) ("Upon final payment ... the payor bank shall be accountable for the amount of the item"). The sale of a motor vehicle is a sale of goods controlled by Article Two on Sales. *First National Bank of Milltown v. Schrader* (1978), 176 Ind.App. 391, 394, 375 N.E.2d 1124, 1125. Thus, final payment for a motor vehicle is not determined by that moment under Article Four when the check is processed and actually paid by the payor bank.

We look instead to Article Two to determine whether the Hummels made final payment. Indiana Code Section 26–1–2–511 defines "tender of payment" as a condition precedent to the seller's duty to complete delivery of goods and provides that tender of payment is sufficient "when made by any means or in any manner current in the ordinary course of business unless the seller demands payment in legal tender."

---

401(1) and Section 2–401(2). *In re Gull Air* resolves this question by observing that while the parties to a sales transaction cannot forestall passage of title after final delivery, Section 2–401(1) also prohibits the passage of title prior to the identification of goods to the contract. *See In re Gull Air*, 73 B.R. at 824; IND.CODE § 26–1–2–401(1) ("Title to goods cannot pass under a contract for sale prior to their identification to the contact"). "In between these extremes, however, the parties may by contract specify the point at which title passes." *In re Gull Air*, 73 B.R. at 824.

**10.** The O'Donnells and Lyons also seem to suggest that the sale was not complete until a check for the amount financed under the Installment Contract, which the Credit Union issued to Raisor Pontiac on June 7, 1991, was debited to the Credit Union's account on June 12, 1991. The flaw in that argument is apparent. Whether Raisor Pontiac sold the Installment Sales Contract to another entity has no bearing on whether final payment had been received by Raisor Pontiac. We agree with the observation made at oral argument by American's counsel that if Raisor Pontiac had not sold the contract and retained the right to collect installment payments over the life of the loan, the O'Donnells' and Lyons' argument would mean that final payment to Raisor Pontiac would not have occurred until Raisor Pontiac received the last payment on the contract. Taken to its logical conclusion, Raisor Pontiac's garage operations policy then would have insured the Hummels' vehicle during the entire term of the contract, a scope of coverage clearly not contemplated in such a policy.

IND.CODE § 26–1–2–511(2). Payment by check is conditional and may be defeated as between the parties if the check is dishonored by the payor bank on presentment. I.C. § 26–1–2–511(3).

Section 2–511(3) acknowledges common commercial practice and the business reality that sales transactions are considered consummated when tender of payment is made by check followed by delivery of goods, or vice versa. Indeed, the Comment to Section 2–511 recognizes that "the taking of a seemingly solvent party's check is commercially normal and proper and, if due diligence is exercised in collection, is not to be penalized in any way." I.C. § 26–1–2–511 Comment 4.

We conclude that the Hummels' tender of two checks and execution of the Installment Contract constituted final payment of the purchase price to Raisor Pontiac. Here, the parties have stipulated that payment for the vehicle was made by check. *See* Reply Brief at 10 (citing *Order Pursuant to Appellate Rule 2(C) Conference,* Stipulations 3 h. and 3 i.). Indeed, the fact that Raisor Pontiac immediately sold the Installment Contract to the Credit Union for cash shows that Raisor Pontiac considered the Installment Contract and the down payment checks to be final payment for the vehicle. Further, this conclusion is not altered by the fact that payment by check is conditional. If the Hummels' checks had been dishonored, Raisor Pontiac would have had full rights to collect on the checks, to sue on the Installment Contract and to repossess its collateral. Both commercial practice and the policy of our commercial code establish that the Hummels made final payment for the vehicle.

## II. Umbrella Policy

The O'Donnells' and Lyons' claim for coverage under Cincinnati's commercial umbrella liability policy merits little discussion. The O'Donnells and Lyons correctly note that under Cincinnati's umbrella policy, the umbrella policy provides primary coverage to Raisor Pontiac if coverage is excluded under American's garage liability policy. Having already concluded that the O'Donnells' and Lyons are not covered under the omnibus clause of the American policy, we construe Cincinnati's policy as the primary coverage policy. However, as Cincinnati points out, the O'Donnells and Lyons must show that the Hummel's purported negligence is covered under the Cincinnati policy.

The O'Donnells and Lyons have not met their burden. Their bare argument that the Cincinnati umbrella policy also covers permissive users of Raisor Pontiac's owned autos fails for the same reason that this argument failed with the American garage liability policy. Even if we were to assume that the Cincinnati umbrella policy were required to contain an omnibus clause providing coverage for permissive users, the Hummels were not permissive users of a Raisor Pontiac-owned vehicle because the Hummels, not Raisor Pontiac, owned the vehicle at the time of the accident with Lyons.

Further, on appeal the O'Donnells' and Lyons' argument must at least contain:

"the contentions of the appellant with respect to the issues presented, the reasons in support of the contentions along with citations to the authorities, statutes, and parts of the record relied upon, and a clear showing how the issues and contentions in support thereof relate to the particular facts of the case under review."

Ind.Appellate Rule 8.3(A)(7). The O'Donnells and Lyons have failed to provide us with cogent argument supporting coverage under the Cincinnati umbrella policy on any other theory. We can find no coverage under the Cincinnati policy.

## CONCLUSION

At the time of the accident between Hummel and Lyons, the Hummels owned the vehicle sold to them by Raisor Pontiac. Accordingly, Hummel could not be a permissive user of a Raisor Pontiac-owned vehicle in use in Raisor Pontiac's garage operations, and Hummel's liability, if any, to the O'Donnells and Lyons is not covered under the American and Cincinnati policies. Thus, the trial court properly granted sum-

mary judgment in favor of American and Cincinnati.

The judgment is affirmed.

GARRARD and MILLER, JJ., concur.